IN THE UNITED STATES DISTRICT COURT
FOR NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 18 SMARTPHONES AND 1 SIM CARD, CURRENTLY LOCATED AT THE ATF MANCHESTER FIELD OFFICE EVIDENCE VAULT | Case No. 1:20-mj- 177-01/19-AJ<br><br>Filed Under Seal – Level I |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Patrick Dawley, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a Special Agent (SA) with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been since February of 2019.  I am currently assigned to the Manchester, New Hampshire Field Office in the Boston Field Division.  While training to become a Special Agent, I attended the Federal Law Enforcement Training Center (FLETC) in Glynco, GA full-time for six-and- a-half months. During my time at FLETC, I received training in practices and methods of illegal firearm possessors, firearm traffickers, and related federal criminal statutes. Prior to becoming an ATF Special Agent, I was a Police Officer for the Reading, Massachusetts Police Department for approximately seven years.  As a Special Agent and Police Officer I have conducted and/or participated in a number

of investigations involving state and federal firearm and controlled substance violations.  I have interviewed multiple victims, sources of information, witnesses, suspects and defendants regarding various types of criminal activity.  I have also served search warrants for various crimes and have made criminal arrests for firearm and controlled substance violations. I participated in state and federal investigations involving possession of illegal weapons including firearms, improvised explosive devices and possession of controlled substances.  I also conducted numerous investigative stops and probable cause searches of people and vehicles.  I participated in physical surveillance operations and participated in the execution of state and federal arrest warrants.

3.     Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities.  However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information.  I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.  I am familiar with the manner in which drug traffickers use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone.

4.     I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other members of law enforcement. Since this affidavit is being submitted for the limited purpose of establishing that

probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrants, it does not set forth all of my knowledge about this matter.

## RELEVANT STATUTES

5.      Title 21, United States Code, Section 841(a)(1), makes it unlawful for any person to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Heroin and Marijuana are Schedule I controlled substances. Cocaine, Crack Cocaine, and Fentanyl are Schedule II controlled substances.

6.      Title 18, United States Code, Section 922(g) reads in pertinent part,

> It shall be unlawful for any person . . . who is an unlawful user of . . . any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) . . . to . . . possess in or affecting commerce, any firearm.

18 U.S.C. § 922(g)(3). An unlawful user of a controlled substance is someone who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician, and unlawful use must have occurred recently enough to indicate that the individual is actively engaged in such conduct. It is not required that such a person use drugs at the precise time that the person possesses a firearm. 27 C.F.R. § 478.11.

7.      Title 18, United States Code, Section 924(c), prohibits the use or carrying of a firearm during and in relation to a drug trafficking offense, or possessing a firearm in furtherance of a drug trafficking offense.

## IDENTIFICATION OF THE ELECTRONIC EQUIPMENT TO BE EXAMINED

8.      This affidavit is being submitted in support of an application for a search warrant

for electronic equipment seized from Leeann OBRIEN ("OBRIEN") pursuant to her arrest and a search warrant conducted on May 12, 2020, on a 2015 Acura RDX, bearing Massachusetts registration 7YN988, registered to OBRIEN, which she was operating at the time of her arrest. All of the following electronic equipment is currently located at the ATF Manchester Field Office Evidence Vault:

a. A dark blue Samsung SM-A102U smartphone bearing International Mobile Equipment Identity ("IMEI") number 359620103205169 ("Telephone 1"), labeled as *ATF Evidence Item #33*;

b. A black Alcatel 6062W smartphone bearing IMEI number 015126004818056 ("Telephone 2"), labeled as *ATF Evidence Item #35*;

c. A black and rosegold LG LGMP260 smartphone bearing IMEI number 359461095734126 ("Telephone 3"), labeled as *ATF Evidence Item #36*;

d. A black Apple iPhone model A1661 smartphone ("Telephone 4"), labeled as *ATF Evidence Item #37*;

e. A white Samsung Galaxy S4 T-Mobile smartphone bearing IMEI number 359086Q50737424 ("Telephone 5"), labeled as *ATF Evidence Item #38*;

f. A black LG LML212VL TracFone Wireless smartphone bearing IMEI number 355987108656025 ("Telephone 6"), labeled as *ATF Evidence Item #39*;

g. A white Apple iPhone (Unknown Model) ("Telephone 7"), labeled as *ATF Evidence Item #40*;

h.   A black Alcatel (unknown model) smartphone bearing IMEI number

015126006713115 ("Telephone 8"), labeled as *ATF Evidence Item #41*;

i.   A dark blue Nokia TA-1136 Verizon smartphone bearing IMEI

359019094040661 ("Telephone 9"), labeled as *ATF Evidence Item #42*;

j.   A pink Apple iPhone Model A1688 smartphone in a black and rosegold case

(unknown model) ("Telephone 10"), labeled as *ATF Evidence Item #43*;

k.   A black Samsung Galaxy S8 smartphone bearing IMEI number

355982080582273 ("Telephone 11"), labeled as *ATF Evidence Item #44;*

l.   A black Apple iPhone Model A1660 smartphone ("Telephone 12"), labeled as

*ATF Evidence Item #45*;

m.   A dark blue Samsung SM-A102U smartphone bearing IMEI number

359620104646940 ("Telephone 13"), labeled as *ATF Evidence Item #46;*

n.   A pink Apple iPhone (unknown model) smartphone in a pink Skech wallet/phone

case ("Telephone 14"), labeled as *ATF Evidence Item #47*;

o.   A black Apple iPhone (unknown model) smartphone in a brown Speck case

("Telephone 15"), labeled as *ATF Evidence Item #69*;

p.   A black Apple iPhone (unknown model) smartphone ("Telephone 16"), labeled as

*ATF Evidence Item #70*;

q.   A white Apple iPhone 11 128GB Verizon smartphone with IMEI

353975103745481 ("Telephone 17"), labeled as *ATF Evidence Item #80*;

r.   A black Wiko Android (unknown model) BoostMobile smartphone ("Telephone 18"), labeled as *ATF Evidence Item #81*;

s.   A SIM card bearing the number 8901260061972599 ("SIM Card 1"), labeled as *ATF Evidence Item #48*;

9.   The applied-for warrant would authorize the forensic examination of the electronic equipment for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### *Background*

10.   Along with other members of law enforcement, I am conducting an investigation of Jose CRUZ ("CRUZ") and Leeann OBRIEN ("OBRIEN") into the illegal trafficking of drugs and firearms in the Manchester, New Hampshire, including the suspected trading of firearms for either drugs or U.S. currency.

11.   On January 16, 2020 OBRIEN was arrested by the Manchester Police Department ("MPD") for possession with intent to distribute marijuana, possession of cocaine, and possession of crack cocaine. MPD seized $1345.00 USD currecny from OBRIEN's person and seized the 2018 gray Nissan Altima, bearing Florida registration IEMR24, which OBRIEN was operating at the time of her arrest, pending a search warrant. CRUZ was the sole passenger in the vehicle and was allowed to leave the scene during the active motor vehicle just prior to the arrest. A state search warrant was obtained for the 2018 gray Nissan Altima, rented in OBRIEN's name, and executed on January 21, 2020. The search warrant yielded a Raven Arms P-25 .25 caliber

pistol, bearing serial number 561422, 21 cell phones, a tablet, 2 laptops, approximately
$25,500.00 in jewelry, seven (7) rounds of 9mm ammunition, approximately 958.4 grams of
suspected marijuana, approximately 20.8 grams of suspected crack cocaine, approximately 18.9
grams of suspected heroin/fentanyl, approximately 15.3 grams of suspected synthetic spice,
approximately 9.6 grams of suspected cocaine, seven (7) vials of testosterone, 117 assorted
controlled pills, a large amount of drug packaging materials, money envelopes and digital scales.
Also located during the search was a drug ledger containing the address for 32 Myrtle Street, Apt
3-C (unknown city and state), a rental receipt for Storage Unit #408, Bluebird Self Storage, 97
Brown Avenue, Manchester, NH (the "Storage Unit") in the name of Jose CRUZ, a receipt for
the purchase of a Sig Sauer P365 9mm pistol, bearing serial number 66A289059, from NH Guns
& Ammo in Derry, NH and assorted bags of personal items belonging to Leeann OBRIEN and
Jose CRUZ. All of the items tested presumptive positive using a TacticID raman spectrometer.

12.     I know through my knowledge training and experience that the quantities of
suspected marijuana found on OBRIEN's person and inside of the vehicle were not consistent
with personal use. I also know that the scales, assorted packaging materials, items such as the
fake Red Bull can containing controlled substances not prescribed to the possessors, a firearm
and a large amount of US Currency found in OBRIEN's purse were all consistent with the
distribution of illegal drugs.

*Suspected Firearms and Drug Trafficking From New Hampshire to Camden, New Jersey*

13.     Between August 2019 to present, OBRIEN and CRUZ have been observed and
confirmed to have traveled from the Manchester, New Hampshire area to Camden, New Jersey
on a regular basis. It has been confirmed through reliable, confirmed sources of information and
through the recovery of numerous firearms originating from New Hampshire, through seizures

and undercover controlled purchase operations, that CRUZ and OBRIEN trafficking illegally

obtained firearms from New Hampshire to Camden, New Jersey in exchange for drugs.

*Federal GPS Tracking Warrant for the 2015 Acura RDX:*

14.    On May 7, 2020, I applied for and was granted a sealed federal tracking warrant

for a Global Positioning System ("GPS") mobile tracking device to be installed on the 2015

Acura RDX. On May 7, 2020, the Honorable Andrea Johnstone, of the District of New

Hampshire, signed the aforementioned sealed federal tracking warrant.

15.    On May 8, 2020, I installed the GPS mobile tracking device on the 2015 Acura

RDX while it was parked on a public way in the vicinity of the 200 block of Concord Street in

Manchester. I learned through the Manchester Street Crimes Unit that during a drug possession

post-arrest debrief of Source T.S. on May 4, 2020, the 2015 Acura RDX had been observed

parked in the parking lot of 286 Concord Street, Manchester. Source T.S. stated both Leeann

OBRIEN and CRUZ were both observed entering the 2015 Acura RDX after exiting 286

Concord Street, Manchester. Between May 4, 2020 and May 8, 2020, the 2015 Acura RDX was

observed in and around the vicinity of the 200 block of Concord Street, as well as parked in the

parking lot of 286 Concord Street, thus corroborating the information.

16.    On May 9, 2020, I observed Leeann OBRIEN arrive to the residence of 141A

Laurel Street, Manchester in the 2015 Acura RDX and enter the residence empty handed. I

observed Leeann OBRIEN exit the residence with two orange packages, one tucked under her

left arm and the other in her left hand. I recalled the orange packaging from suspected drugs

seized during the execution of a state search warrant on January 21, 2020 on a Hertz rental

vehicle, bearing Florida registration IEMR24, rented to Leeann OBRIEN. I know through my

training and experience that the size of the orange packaged suspected drugs were consistent

with distribution related quantities of drugs. Leeann OBRIEN later made frequent stops to known high crime areas in and around the City of Manchester.

17.     On May 11, 2020, I observed surveillance video of the 2015 Acura RDX at Z1Xpress Gas Station located on Goffstown Back Road in Goffstown, NH, which according to the GPS mobile tracking device record, the 2015 Acura RDX visited on May 10, 2020 at approximately 3:11 PM. I observed Leeann OBRIEN fill the 2015 Acura RDX with gasoline with the driver's side door opened. I readily observed and identified an orange package on the opened door, which was consistent with the orange packages observed in the hands of Leeann OBRIEN on May 9, 2020, while exiting 141A Laurel Street, Manchester and from the suspected drugs seized from the state search warrant on January 21, 2020.

18.     On May 11, 2020 I observed Leeann OBRIEN abruptly leave the residence of 141A Laurel Street, Manchester and leave the area in the 2015 Acura RDX. According to GPS mobile tracking device record, the 2015 Acura RDX travelled to the vicinity of Amherst Street at Beech Street, which is where the MPD Street Crimes Unit observed CRUZ, Leeann OBRIEN and the 2015 Acura RDX on February 27, 2020 after leaving the Storage Unit.

*May 11-12, 2020: Trip to Camden, New Jersey*

19.     I observed the GPS mobile tracking device record to show the 2015 Acura RDX left the Manchester, New Hampshire area on May 11, 2020, at approximately 9:11 PM, and traveled down to the Camden, New Jersey area, arriving at approximately 3:19 AM on May 12, 2020. In Camden, New Jersey, the 2015 Acura RDX made several brief stops, to include the following locations and durations in and near the area known as Whitman Park:

    a.  1234 Whitman Avenue – 3 minutes 53 seconds
    b.  1983 Carman Street – 5 minutes 10 seconds
    c.  1259 Park Boulevard – 3 minutes 47 seconds

    d.   1329 Jackson Street – 17 minutes 29 seconds

    e.   1981 Carman Street – 4 minutes 1 second

    f.   1259 Park Boulevard – 4 minutes 53 seconds

20.    The Whitman Park area in Camden, New Jersey is a known high crime area. On November 20, 2019, ATF Intelligence Research Specialist (IRS) Phillip Geppi compiled data of violent criminal activity occurring in Whitman Park between January 2018 to November 2019 utilizing law enforcement intelligence databases. According to the data compiled by IRS Geppi, from January 2018 to November 2019, the following activity occurred in Whitman Park:

    a.   Between December 2018 and October 2019, law enforcement identified and documented approximately forty-four (44) incidents of known DTO (Drug Trafficking Organization) sets.

    b.   From January 2018 to October 2019, there were approximately two hundred and forty-one (241) ShotSpotter incidents.

    c.   Between December 2018 and November 2019, there were approximately fourteen (14) shooting hit incidents. Of those 14 shooting hit incidents, four (4) were shooting murders. The National Integrated Ballistics Information Network (NIBIN) has linked at least two (2) shooting incidents occurring in Whitman Park with additional shooting incidents in the Camden County, NJ area.

    d.   Between November 2018 and November 2019, law enforcement recovered approximately forty-one (41) crime guns from the Whitman Park area.

21.    From my training and experience, I know that the frequent stops recorded by the GPS mobile tracking device in and around the Whitman Park area is consistent with individuals

engaged in drug trafficking activity. Further, the GPS mobile tracking device recorded that the vehicle left the Camden, New Jersey area at approximately 4:28 AM (May 12, 2020) and arrived in the Manchester, New Hampshire area at 11:09 AM (May 12, 2020). In summary, the 2015 Acura RDX drove approximately six hours to Camden, New Jersey, remained in area for approximately for one hour, and then drove another six and one-half hours to return to Manchester, New Hampshire. This behavior is also consistent with individuals, who are engaged in unlawful drug trafficking, attempting to resupply their drug inventory.

22.     Further, LPR information captured the 2015 Acura RDX on still photos on May 11, 2020, 1:17 AM, on Silas Deane Highway Wethersfield, CT and May 12, 2020, at 3:27 AM, on Mount Ephraim Avenue Camden, New Jersey. That information corroborates that GPS mobile tracking device was still installed on the 2015 Acura RDX.

### *May 12, 2020 Arrest of Leeann OBRIEN by MPD:*

23.     On May 12, 2020, at approximately 11:05 AM, MPD Detective O`Connor and Detective Trudeau located the 2015 Acura RDX, operated by Leeann OBRIEN, on I-93 Northbound by Exit 5. The vehicle was observed making a lane shift on I-93 Northbound without using a required signal, south of the I-93 / I-293 Northbound split. It was decided that based on the information received regarding the illegal drug and firearms trafficking, subject involved with a previous drug arrest history and subsequent motor vehicle violation that a stop of the 2015 Acura RDX, utilizing an MPD Unmarked Police Vehicle, equipped with emergency lights and sirens, was conducted on Exit 1, I-293N toward South Willow Street, Manchester. Detective Trudeau and Detective O`Connor made initial contact with Leeann OBRIEN and her passenger who was identified as CRUZ.

24.     Due to officer safety concerns, due to past firearms possession for both Leeann
OBRIEN and Jose CRUZ, both parties were asked and complied with exit orders and were
separated.

25.     CRUZ stated to MPD Detectives that he and Leeann OBRIEN left Manchester
NH that morning around 6:30 – 7:30 AM. He said that they drove down to Somerville,
Massachusetts in the 2015 Acura RDX where Leeann OBRIEN visited family for about an hour
and returned back to Manchester where they were pulled over. CRUZ denied stopping anywhere
else along the way.

26.     Leeann OBRIEN told MPD Detectives that she and CRUZ drove down to New
Jersey yesterday in the 2015 Acura RDX so that CRUZ's family could work on the 2015 Acura
RDX. Leeann OBRIEN said that they spent the night in New Jersey and that they were now
heading back home to Laurel Street, Manchester. When Leeann OBRIEN was asked if they
stopped anywhere else on the way back from New Jersey, she stated "Only to get gas". MPD
Detectives asked specifically if Leeann OBRIEN stopped anywhere else on the way back for an
extended period of time and spoke with anyone to which she stated "No...We drove straight
back." The stories of Leeann OBRIEN and CRUZ were vastly conflicting. I know that subjects
involved with trafficking firearms and illegal drugs will lie about their whereabouts as they do
not want to tip-off law enforcement of their source.

27.     Leeann OBRIEN was asked if she has been arrested before for illegal drugs, to
which she stated "Yes." Leeann OBRIEN was asked if there were drugs on her person or in her
vehicle, to which she said "No." Leeann OBRIEN refused consent to search her person nor the
vehicle and requested all questions be directed to her attorney. MPD Detectives provided Leeann
OBRIEN her Miranda Rights to which she stated she understood. MPD Detectives further

explained to her that at that time she was not under arrest and was free to leave if she so chose, but her vehicle was being seized pending a search warrant. I learned MPD Detective Duchesne observed Leeann OBRIEN look away, toward the ground and her shoulders sunk in a deflated state without disputing the seizure of the 2015 Acura RDX.

28.      I learned from MPD Detective Trudeau that Leeann OBRIEN later provided consent to have her person searched. During that consensual search MPD Detective Trudeau located a rolled $20.00 bill and a $1.00 bill, both with a powdery residue believed to be Heroin /Fentanyl. Detective Trudeau placed Leeann OBRIEN under arrest for Possession of Controlled Drug. It was also known that Leeann had an active arrest warrant from Manchester, NH for Possession of Controlled Drugs.

*Federal Search Warrant on Acura RDX*

29.      On May 12, 2020, the Honorable Magistrate Johnstone granted a sealed federal search warrant for the 2015 white Acura RDX, which was operated by OBRIEN during the encounter that led her arrest on May 12, 2020.

30.      As a result of the search warrant I observed the following items located inside of the vehicle:

  a.   Telephone 1 and a black Northface jacket containing: the New Hampshire Driver's License of OBRIEN, as well as three (3) credit cards in OBRIEN's name, eleven (11) gift cards) and the debit card and Massachusetts driver's license of Dylan Johnson, a reported missing person in Natick, Massachusetts, were found on the front driver's seat.

b.  Telephone 17 and Telephone 18 were found in the center console. Telephone 18 had an incoming text message visible on the screen, without manipulating the phone, that read "OK well im going to grab 80, I need a gram & @ 30 of hard".

    i.  I know through my training and experience that the cost of a gram of heroin in the Manchester area is approximately $70-80 and "30 of hard" was in reference to $30 of crack cocaine, often referred to as "hard".

c.  A folded $10 USD bill containing white residue, suspected to be cocaine, $512 USD currency, a digital scale and five (5) suspected ecstacy pills wrapped in cellphone were found in the locked glove compartment.

d.  A digiweigh fake cellphone digital scale was found in a black Nike dufflebag in the back seat.

e.  Telephone 15 and Telephone 16 were found inside of a small backpack in the back seat.

f.  Telephones 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 and SIM Card 1 were found in a small Coach bag in the back seat.

    i.  The manner in which the phones were packaged was similar to that of the twelve (12) smartphones packaged together and total of twenty (20) smartphones seized on the January 21, 2020 search warrant of the 2018 gray Nissan Altima, rented by OBRIEN

g.  PayPal Prepaid Mastercard paperwork and legal paperwork in the name of "Leeann OBRIEN" was located in a large Coach purse in the back seat.

14

h. A Coach wallet was found in the backseat containing: one (1) Sig Sauer 9mm Luger round of controlled expansion ammunition, commonly referred to as "hollow point"; one (1) opened Suboxone wrapper containing a partial dose of sublingual Suboxone strips; five (5) assorted identifications cards in the name of Leeann OBRIEN to include her Social Security Card; RTN Federal Credit Union Member Identification Card in the name of Leeann OBRIEN; four (4) credit cards in the name of Leeann OBRIEN; and an Apple store gift card.

i. A black, blue and orange Puma duffle bag was located in the trunk containing assorted drug packaging materials to include Chase Bank money envelopes and assorted rubber gloves. The money envelopes matched the envelopes documented during the January 21, 2020 search warrant. A Clorox Wipes container with a hidden compartment was also found inside of the Puma duffle bag.

   i. I know through my training and experience that items with hidden compartments, referred to as "hides", or used by drug traffickers to conceal drugs from law enforcement detection.

31. All of the evidence was logged and secured in the ATF Manchester Field Office Evidence Vault.

32. Based on my training and experience, including my knowledge of drug trafficking, I know that traffickers often have a range of different substances available for distribution to cater to the needs of different customers.

33. Based on the proximity of the electronic equipment to the seized drugs and other evidence of drug trafficking, OBRIEN, CRUZ and possibly others have used the electronic

equipment, including cellular telephones, to participate in and facilitate illegal activity.

34.    In addition, based on my training and experience, and information provided to me by other agents, I am aware that individuals involved in drug trafficking frequently use computers and other electronic devices, including smartphones, to carry out, communicate about, and store records related to drugs and drug trafficking.  These tasks are frequently accomplished through text messages, encrypted messages, and photographs.  Based on my training and experience, I know that dealers and others involved in the drug trade frequently utilize multiple mobile phones in connection with their illegal drug activity.  For example, individuals involved in drug trafficking frequently utilize one phone to communicate with drug customers and another phone to communicate with other drug-related associates (*e.g.*, suppliers, runners, organizers).  Individuals involved in drug trafficking frequently change their phones and/or phone numbers, and their utilization of multiple phones can mitigate the disruption associated with these changes (for example, a dealer can change the phone used to communicate with drug suppliers or organizers while not changing the phone used to communicate with customers, or vice versa).

35.    The sheer volume of electronic devices here is overwhelming and at odds with normal electronic device ownership and use, contributing to the strong inference that the phones were being used to conduct illegal activity.

### TECHNICAL TERMS

36.     Based on my training and experience, I use the following technical terms to convey the following meanings:

     a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication

through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the electronic equipment.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

17

c. Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used
     for storing data (such as names, addresses, appointments or notes) and utilizing
     computer programs.  Some PDAs also function as wireless communication
     devices and are used to access the Internet and send and receive e-mail.  PDAs
     usually include a memory card or other removable storage media for storing data
     and a keyboard and/or touch screen for entering data.  Removable storage media
     include various types of flash memory cards or miniature hard drives.  This
     removable storage media can store any digital data.  Most PDAs run computer
     software, giving them many of the same capabilities as personal computers.  For
     example, PDA users can work with word-processing documents, spreadsheets,
     and presentations.  PDAs may also include global positioning system ("GPS")
     technology for determining the location of the electronic equipment.

f.   Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller
     than a notebook that is primarily operated by touching the screen.  Tablets
     function as wireless communication devices and can be used to access the Internet
     through cellular networks, 802.11 "Wi-Fi" networks, or otherwise.  Tablets
     typically contain programs called apps, which, like programs on a personal
     computer, perform different functions and save data associated with those
     functions.  Apps can, for example, permit accessing the Web, sending and
     receiving e-mail, and participating in Internet social networks.

g.   Pager:  A pager is a handheld wireless electronic device used to contact an
     individual through an alert, or a numeric or text message sent over a

telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the electronic equipment communicating with each other are in the same state.

37.  Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online on their public domain websites, I know that the electronic equipment has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover,

among other things, evidence that reveals or suggests who possessed or used the electronic equipment.

38.      Based on my training, experience, and search, I know that the use of the internet and downloaded applications are used by persons as an alternative means of communication, to obtain information, directions and purchase supplies for the packaging and distribution of illegal dangerous drugs, as well as for the procurement and distribution of firearms.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

39.      Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the electronic equipment.  This information can sometimes be recovered with forensics tools.

40.      *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the electronic equipment was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the electronic equipment because:

      j.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the

device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

k.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

l.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

m.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

42.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night. I intend to present the device to a forensic examiner for content extraction.

## **CONCLUSION**

43.     I submit that this affidavit supports probable cause that the electronic equipment contains evidence of the distribution of and possession with intent to distribute  controlled substances, in violation of 21 U.S.C. § 841, and other violations, and for a search warrant authorizing the examination of the electronic equipment described in Attachment A to seek the items described in Attachment B.

Dated: September 29, 2020              /s/ Patrick Dawley
                                       Patrick Dawley
                                       Special Agent
                                       Bureau of Alcohol, Tobacco, Firearms,
                                       & Explosives

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Hon. Andrea Johnstone
United States Magistrate Judge
District of New Hampshire
**Sep 30, 2020**

## ATTACHMENT A

All of the following electronic equipment is currently located at the ATF Manchester Field Office Evidence Vault:

j.  A dark blue Samsung SM-A102U smartphone bearing International Mobile Equipment Identity ("IMEI") number 359620103205169 ("Telephone 1"), labeled as *ATF Evidence Item #33*;

k.  A black Alcatel 6062W smartphone bearing IMEI number 015126004818056 ("Telephone 2"), labeled as *ATF Evidence Item #35*;

l.  A black and rosegold LG LGMP260 smartphone bearing IMEI number 359461095734126 ("Telephone 3"), labeled as *ATF Evidence Item #36*;

m.  A black Apple iPhone model A1661 smartphone ("Telephone 4"), labeled as *ATF Evidence Item #37*;

n.  A white Samsung Galaxy S4 T-Mobile smartphone bearing IMEI number 359086Q50737424 ("Telephone 5"), labeled as *ATF Evidence Item #38*;

o.  A black LG LML212VL TracFone Wireless smartphone bearing IMEI number 355987108656025 ("Telephone 6"), labeled as *ATF Evidence Item #39*;

p.  A white Apple iPhone (Unknown Model) ("Telephone 7"), labeled as *ATF Evidence Item #40*;

q.  A black Alcatel (unknown model) smartphone bearing IMEI number 015126006713115 ("Telephone 8"), labeled as *ATF Evidence Item #41*;

r.  A dark blue Nokia TA-1136 Verizon smartphone bearing IMEI 359019094040661 ("Telephone 9"), labeled as *ATF Evidence Item #42*;

s.  A pink Apple iPhone Model A1688 smartphone in a black and rosegold case (unknown model) ("Telephone 10"), labeled as *ATF Evidence Item #43*;

t.  A black Samsung Galaxy S8 smartphone bearing IMEI number 355982080582273 ("Telephone 11"), labeled as *ATF Evidence Item #44;*

u.  A black Apple iPhone Model A1660 smartphone ("Telephone 12"), labeled as *ATF Evidence Item #45*;

v.  A dark blue Samsung SM-A102U smartphone bearing IMEI number 359620104646940 ("Telephone 13"), labeled as *ATF Evidence Item #46;*

w.  A pink Apple iPhone (unknown model) smartphone in a pink Skech wallet/phone case ("Telephone 14"), labeled as *ATF Evidence Item #47;*

x.  A black Apple iPhone (unknown model) smartphone in a brown Speck case ("Telephone 15"), labeled as *ATF Evidence Item #69*;

y.  A black Apple iPhone (unknown model) smartphone ("Telephone 16"), labeled as *ATF Evidence Item #70*;

z.  A white Apple iPhone 11 128GB Verizon smartphone with IMEI 353975103745481 ("Telephone 17"), labeled as *ATF Evidence Item #80*;

aa. A black Wiko Android (unknown model) BoostMobile smartphone ("Telephone 18"), labeled as *ATF Evidence Item #81*;

bb. A SIM card bearing the number 8901260061972599 ("SIM Card 1"), labeled as *ATF Evidence Item #48*;

This warrant authorizes the forensic examination of the electronic equipment for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the electronic equipment described in Attachment A that relate to

violations of 18 U.S.C. § 922(g)(3), Possession of a Firearm by a Drug User, 21 U.S.C. § 841,

Unlawful Distribution and Manufacturing of a Controlled Substance, and 18 U.S.C. § 924(c),

possession or use of a firearm in furtherance of drug trafficking, including:

   a.   any information, including text messages, videos, photographs, internet browser
        history and application use, related to the possession of a firearm and/or drug use,
        distribution, or manufacturing.

   b.   any information related to sources of firearms and drugs (including names,
        addresses, phone numbers, or any other identifying information).

   c.   Any information related to the conversion of proceeds of illegal firearm and drug
        distribution proceeds into other items of value, like jewelry.

2.      Evidence of user attribution showing who used or owned the electronic equipment

at the time the things described in this warrant were created, edited, or deleted, such as logs,

phonebooks, saved usernames and passwords, documents, and browsing history;

   As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that

can store data) and any photographic form.